**Affirmed in Part, Reversed and Remanded in Part, and Opinion filed August 27, 2015.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-13-00094-CV

---

**JAMES STEARNS, Appellant**

**V.**

**LISA MARTENS AND STEARNS POOLS AND SPAS, INC., Appellees**

---

**On Appeal from the 268th District Court
Fort Bend County, Texas
Trial Court Cause No. 09-DCV-169484**

---

# O P I N I O N

This is an appeal from a divorce decree following a jury trial on one issue and a bench trial on other issues. The issue at the jury trial was whether the stock of a corporation was community property or the separate property of either spouse. After the wife rested her case-in-chief and before the husband offered evidence in his case-in-chief, the trial court granted a directed verdict that forty-nine percent of the shares were the wife's separate property. The trial court based its decree on the

jury's verdict that the remaining shares were community property. The trial court later conducted a bench trial on various other issues and rendered a final divorce decree, which incorporated sanctions against the husband based on his failure to appear personally at a court-ordered mediation.

On appeal, we conclude the trial court reversibly erred in the following ways: (1) granting the directed verdict, (2) excluding expert valuation testimony offered by the husband during the bench trial, and (3) sanctioning the husband for failing to appear at mediation. Although we affirm the trial court's grant of divorce and dissolution of the marriage, we reverse the remainder of the divorce decree and remand for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Appellee/petitioner Lisa Martens filed a divorce petition against appellant/respondent James Stearns ("Jim"). Jim asserted a counter-petition against Lisa, and Lisa made appellee Stearns Pools & Spas, Inc. ("Stearns Pools") a party to the suit. Before marriage to Lisa, Jim started a pool business as a proprietorship. In 1998, approximately seven years after their marriage began, the pool business was transferred to Stearns Pools. One million shares of Stearns Pools were issued, 490,000 in Jim's name and 510,000 in Lisa's name.

Jim served in the United States Army Reserve. In 2004, Jim deployed to Iraq. Four years later, Jim deployed to Afghanistan. Before deploying, Jim and Lisa executed a Stock Transfer Agreement effective as of January 1, 2008 (the "Agreement"). The Agreement provides, among other things, that "[Jim] hereby sells all of [Jim's] Stock of [Stearns Pools] to [Lisa] and [Lisa] hereby purchases such Stock from [Jim] in exchange for the payment of Ten and no/100 Dollars and other good and valuable consideration, the receipt and sufficiency of which is

2

hereby acknowledged." The Agreement does not contain any statement that any part of its consideration was Jim's separate property, nor does the Agreement contain the terms "gift," "partition," "separate property," "separate use," or "separate estate." After the transaction, Stearns Pools's corporate records reflected that Lisa owned all of the outstanding shares of common stock.[1]

In February 2009, Jim returned from deployment in Afghanistan. Shortly thereafter, Lisa presented Jim with her divorce petition. A major issue in the divorce proceeding was the marital-property characterization of the Stearns Pools common stock. Lisa maintained that all of the stock was her separate property. Jim disputed that characterization and, at times, asserted that all of the stock was community property. As petitioner, Lisa presented her case to the jury first. After Lisa rested in her case-in-chief, but before Jim had an opportunity to present evidence in his case-in-chief, Lisa moved for a directed verdict. Lisa asserted that she had proved as a matter of law that the 490,000 shares in Stearns Pools were her separate property under three theories:

(1) By means of the Agreement, Jim made a gift of these shares to Lisa;

(2) The Agreement is a valid and enforceable partition or exchange agreement under Family Code section 4.102; and

(3) The Agreement is a valid means of making the shares the separate property of Lisa by a sale of the shares from Jim to Lisa.

Lisa also argued that under the Agreement all one million shares of Stearns Pools were made her separate property.

The trial court granted Lisa's motion for directed verdict as to the 490,000 shares in Stearns Pools but did not grant the motion as to the remaining shares.

---

[1] Lisa later transferred thirty percent of the common stock of Stearns Pools to her sister, but Lisa later revoked this transfer, and we need not address it.

3

The trial court overruled Jim's objection to the granting of a directed verdict at the close of Lisa's case-in-chief, before Jim's case-in-chief. In response to the only issue submitted to it, the jury found that the remaining 510,000 shares of Stearns Pools were community property. The parties then tried various other issues to the court, including the value of Stearns Pools.

The trial court appointed Jay Dale as an appraiser to value Stearns Pools. Dale valued the company at $544,699. Jim thought that Stearns Pools was worth significantly more than this appraised value, and he retained George Abraham as an expert witness. Abraham valued Stearns Pools at approximately $1.6 million in his expert report. When Jim called Abraham as a witness during the bench trial, the trial court sustained Lisa's objection that it would be inappropriate to allow Abraham to testify because Dale was a "joint expert," appointed by the court, to whom Jim and Lisa had agreed. Lisa advocated for Dale's valuation. In its fact findings, the trial court valued Stearns Pools at $544,699, the value placed by Dale. The trial court rendered a final divorce decree that incorporated sanctions the trial court earlier had assessed against Jim for failing to appear personally at a court-ordered mediation.

## II.   ISSUES AND ANALYSIS

In appealing the divorce decree, Jim asserts sixteen issues.[2] The main trial-court rulings he challenges on appeal are the granting of a directed verdict at the close of Lisa's case-in-chief, the exclusion of Jim's expert's testimony, the failure

---

[2] Lisa moved to dismiss this appeal because, according to Lisa, (1) Jim allegedly voluntarily accepted the benefits of the divorce decree in various ways and therefore Jim is estopped from challenging the decree on appeal; and (2) Jim is estopped from appealing the decree because he has unclean hands based on various alleged acts and omissions. This court denies Lisa's motion by an order issued today.

4

to give Jim credit for monies that Lisa allegedly should have paid to him under temporary orders, the failure to give Jim credit for rents and revenues Lisa received from community properties, and the imposition of monetary sanctions against Jim for his failure to attend personally a court-ordered mediation.

**A. Did the trial court reversibly err in granting a directed verdict at the close of Lisa's case-in-chief?**

Under his first seven issues, Jim asserts the trial court reversibly erred in granting a directed verdict at the close of Lisa's case-in-chief that 490,000 of the Stearns Pools shares are Lisa's separate property. According to basic principles of trial procedure, a trial court should not render a directed verdict against a party before that party has had a full opportunity to present the party's case and has rested. *See Tana Oil & Gas Corp. v. McCall*, 104 S.W.3d 80, 82 (Tex. 2003); *Nassar v. Hughes*, 882 S.W.2d 36, 38 (Tex. App.—Houston [1st Dist.] 1994, writ denied); *Cecil Pond Constr. Co. v. Ed Bell Investments, Inc.*, 864 S.W.2d 211, 214 (Tex. App.—Tyler 1993, no writ). If a trial court renders a directed verdict against a party before that party has rested its case-in-chief, the trial court's directed verdict is reversible error absent application of the exception recognized by the Supreme Court of Texas. *See Tana Oil & Gas Corp.*, 104 S.W.3d at 82; *Schade v. Rhodes*, No. 01-03-00302-CV, 2004 WL 1355094, at *3, n.2 (Tex. App.—Houston [1st Dist.] June 17, 2004, no pet.) (mem. op.); *Wedgeworth v. Kirskey*, 985 S.W.2d 115, 116 (Tex. App.—San Antonio 1998, pet. denied); *Nassar*, 882 S.W.2d at 38; *Cecil Pond Constr. Co.*, 864 S.W.2d at 214. In *Tana Oil*, the high court concluded that granting a directed verdict before the plaintiffs rested was harmless error because, even if the plaintiffs had proved the claims, the plaintiffs would not have been able to recover since the plaintiffs affirmatively limited the claims to damages they could not recover as a matter of law. *See Tana Oil & Gas Corp.*, 104 S.W.3d at 82. The *Tana Oil* court stressed that the basis for directed verdict had nothing to

5

do with an assessment of the trial evidence. *See id*.

In the case under review, the trial court granted a directed verdict in favor of Lisa after she rested her case-in-chief and before Jim even had a chance to present his case-in-chief. The trial court overruled Jim's objection to the court's grant of a directed verdict at the close of Lisa's case-in-chief, before Jim's case-in-chief.[3] Lisa asserted that she was entitled to a directed verdict because she had proved as a matter of law that the 490,000 shares in Stearns Pools were her separate property. Notably, all of the potential independent bases for affirming the trial court's directed verdict require a review or assessment of the trial evidence, and none of these bases rely on Jim's purported affirmative limitation of his claims to damages he cannot recover as a matter of law. Today's case does not fall within the *Tana Oil* exception. *See Tana Oil & Gas Corp.*, 104 S.W.3d at 82. Instead, it falls within the general rule. Therefore, the trial court reversibly erred in granting a directed verdict against Jim before he had an opportunity to present his case-in-chief. *See id.*; *Schade v. Rhodes*, 2004 WL 1355094, at \*3, n.2; *Wedgeworth*, 985 S.W.2d at 116; *Nassar*, 882 S.W.2d at 38; *Cecil Pond Constr. Co.*, 864 S.W.2d at 214.

On appeal, Lisa essentially argues that an instrument in which one spouse transfers property (whether separate or community) to the other spouse creates an

---

[3] On appeal, Lisa argues that Jim waived any complaint regarding the trial court's directed verdict by failing to object to the directed verdict until after it had been granted. Generally, a party against whom a directed verdict has been granted is not required to preserve error in the trial court regarding a complaint that the trial court reversibly erred in granting the directed verdict. *See Field v. AIM Management Group, Inc.*, 845 S.W.2d 469, 473 (Tex. App.—Houston [14th Dist.] 1993, no writ). But, even presuming for the sake of argument that Jim was required to object in the trial court to the premature granting of a directed verdict against him, we conclude that Jim's objection was timely because Jim made it shortly after the trial court granted the directed verdict, at a time when the trial court still was in a position to avoid the error by withdrawing the directed verdict and reconsidering the directed-verdict issue after Jim had rested his case-in-chief.

6

irrebuttable presumption that the property became the transferee's separate property, even if the document does not contain any "separate property recitals" or "significant recitals."[4] Lisa argues that any error by the trial court in granting a directed verdict before Jim rested his case-in-chief is harmless because: (1) Jim did not seek to set aside the Agreement based on fraud, accident, mistake, or duress; and (2) the parol evidence rule precludes consideration of extrinsic evidence that Lisa and Jim did not intend to change the marital-property characterization of the transferred shares, even if the Agreement contains no separate-property recitals. Even if this argument were meritorious, it is not based on Jim's affirmative limitation of his claims to damages he cannot recover as a matter of law, and this argument does involve an assessment of the trial evidence. Therefore, this argument does not show that the case falls within the *Tana Oil* exception. *See Tana Oil & Gas Corp.*, 104 S.W.3d at 82.

In any event, we agree with the body of cases in which courts of appeals hold that, if the instrument contains no separate-property recitals, then parol evidence is admissible regarding the marital-property issue. *See Reaves v. Reaves*, No. 11-11-00026-CV, 2012 WL 3799668, at *6–7 (Tex. App.—Eastland Aug. 31, 2012, no pet.) (mem. op.); *Bahr v. Kohr*, 980 S.W.2d 723, 726–27 (Tex. App.—

---

[4] According to Lisa, the only way that the transferor-spouse in such an instrument can avoid the property becoming the separate property of the transferee-spouse is by proving that the transfer was procured by fraud, accident, mistake, or duress. Because fraud, accident, mistake, and duress are potential bases for setting aside the instrument, Lisa essentially asserts that, unless the transferor spouse can set aside such an instrument, that document creates an irrebuttable presumption that the effect of the transfer is to make the property the transferee's separate property, even if the document does not contain any "separate property recitals" or "significant recitals." A "separate property recital" or "significant recital" is a recital in an instrument that the consideration comes from the separate property of a spouse or that the property is transferred to a spouse as the transferee's separate property or for the transferee's separate use. *See Roberts v. Roberts*, 999 S.W.3d 424, 432 (Tex. App.—El Paso 1999, no pet.).

San Antonio 1998, no pet.). *But see Magness v. Magness*, 241 S.W.3d 910, 912–13 (Tex. App.—Dallas 2007, pet. denied); *Raymond v. Raymond*, 190 S.W.3d 77, 80–81 (Tex. App.—Houston [1st Dist.] 2005, no pet.).[5] Because the Agreement contains no separate-property recitals, parol evidence is admissible regarding the marital-property issue, and there is no irrebuttable presumption that the transferred shares are Lisa's separate property. *See Reaves*, 2012 WL 3799668, at *6–7; *Bahr*, 980 S.W.2d at 726–27. *But see Magness*, 241 S.W.3d at 912–13; *Raymond*, 190 S.W.3d at 80–81.

We conclude that the trial court reversibly erred in granting a directed verdict at the close of Lisa's case-in-chief. The proper remedy is to reverse the decree and remand for a new jury trial. *See Thomas v. Olympus/Nelson Prop. Mgmt.*, 148 S.W.3d 395, 401 (Tex. App.—Houston [14th Dist.] 2004, no pet.). As to the scope of that remedy, we note that the marital-property characterization of the other 510,000 shares of Stearns Pools stock was disputed at trial. Some of the characterization arguments are the same or similar for all of the Stearns Pools shares. Lisa argued that, under the Agreement, all one million shares of stock are her separate property. On this record, we conclude that the trial court's error affects all of the matters in controversy at the jury trial and that the characterization issue regarding the 490,000 shares is not separable from the characterization issue regarding the 510,000 shares without unfairness to the parties. *See* Tex. R. App. P. 44.1(b); *Downing v. Burns*, 348 S.W.3d 415, 427–29 (Tex. App.—Houston [14th Dist.] 2011, no pet.). Therefore, we sustain Jim's first through seventh issues to the extent that Jim argues the trial court reversibly erred in granting a directed

---

[5] The parties have not cited and research has not revealed any precedent from the Supreme Court of Texas determining this issue. Lisa has cited a 1997 unpublished case from this court, *Brothers v. Brothers*, No. 14-96-00364-CV, 1997 WL 7012 (Tex. App.—Houston [14th Dist.] Jan. 9, 1997, no writ) (not designated for publication). But, that case has no precedential value. *See* Tex. App. P. 47.7 & 2008 cmt.

verdict at the close of Lisa's case-in-chief. We reverse the trial court's decree and remand for a new jury trial as to the characterization of all one million shares of Stearns Pools stock.

### B. Did the trial court reversibly err in excluding expert testimony of George Abraham regarding the value of Stearns Pools?

Under his ninth through thirteenth issues, Jim argues that the trial court reversibly erred in refusing to allow Jim's expert to testify at the bench trial regarding his opinion of the value of Stearns Pools. Lisa objected and urged the trial court not to allow Abraham to testify because Dale was a "joint expert" appointed by the court. The trial court sustained Lisa's objection, disallowed Abraham's testimony, and valued Stearns Pools at $544,699, in accordance with Dale's valuation.

In temporary orders, the trial court ordered the parties' trial counsel to "select reasonable agreed upon appraisers for performing appraisals for the business Stearns Pools & Spas, Inc. and the real properties of the parties within fifteen (15) days." After more than fifteen days had passed and Jim's counsel had not suggested any person to perform the appraisal of Stearns Pools, Lisa and Stearns Pools moved the trial court for an order appointing Dale to perform the appraisal. At an oral hearing, Jim's counsel stated that he did not oppose the appointment of an appraiser and wanted more time to investigate other individuals who might be appointed to perform the appraisal. The trial court granted the motion and gave all parties thirty more days to agree on an appraiser. On the same day, the trial court signed a docket control order requiring the parties to contract with an appraiser within thirty days. At no time during this hearing did the trial court or any party state that this appraiser's valuation would be final and binding on all parties or that the parties would be precluded from calling experts other than the appointed appraiser to offer evidence on the valuation issue. Nor did the

9

parties' subsequent conduct suggest any such understanding.

Within the thirty-day period, the parties signed a letter agreement with Dale for him to prepare an appraisal of the value of Stearns Pools. Though the letter refers to Dale as a "neutral expert," it does not state that Dale's valuation of Stearns Pools would be binding on all parties or that the parties would be precluded from calling other experts to testify on the valuation issue. The parties also signed an agreement under Texas Rule of Civil Procedure 11, in which they agreed to a deadline for Dale to perform the appraisal. The trial court later signed a docket control order containing this deadline for the completion of Dale's appraisal as well as setting a later deadline for the designation of testifying experts and the exchange of these experts' reports. Under this order, Jim timely designated Abraham as a testifying expert and timely provided an expert report from Abraham, which described Abraham's appraisal valuing the company at approximately $1.6 million.[6]

Lisa designated Dale and two other individuals as experts to testify regarding the appraisal of Stearns Pools. Lisa asserts that she retained these experts to support the valuation in Dale's appraisal rather than to perform another appraisal as Abraham did. Nonetheless, Lisa still retained and designated experts other than Dale to testify regarding the company's value. In a supplemental designation, Lisa designated one of these other experts to testify regarding his review of Abraham's appraisal of the company. Even presuming that Dale was an agreed expert retained by all parties at the instance of the trial court to perform an appraisal of Stearns Pools, the parties did not agree and the trial court did not order

---

[6] Lisa asserts that Abraham's testimony was improper because Abraham was required to conduct his appraisal of Stearns Pools by the earlier deadline, but he failed to do so. Under the unambiguous language of the docket control order and the Rule 11 agreement that gave rise to it, the earlier deadline applied only to Dale's appraisal.

10

that Dale's valuation would be final and binding on all parties or that the parties would be precluded from calling any expert on the valuation issue other than the appointed expert.

Lisa asserts that the trial court did not err in excluding Abraham's testimony because Jim judicially admitted that the value of the company was the value to which Dale testified. Lisa bases this argument on a document entitled "James Stearns' Proposed Final Division of Property," which the trial court admitted into evidence at the bench trial. This document lists various properties, and one of the items on the list is "SPS Value (Dale)," for which the value is $544,700, the value to which Dale testified. This statement was not made in a pleading, and we conclude that it does not rise to the level of a judicial admission by Jim as to the company's value. *See Regency Advantage Ltd. P'ship v. Bingo Idea–Watauga, Inc.,* 936 S.W.2d 275, 278 (Tex. 1996); *In re S.A.M.,* 321 S.W.3d 785, 790, n. 1 (Tex. App.—Houston [14th Dist.] 2010, no pet.). Jim filed an inventory and appraisement in which he listed the value of the company as approximately $1.6 million.

Lisa also points to testimony by Jim during cross-examination regarding "James Stearns' Proposed Final Division of Property." When asked whether Jim indicated that the value of Stearns Pools was $544,700, Jim said that he had indicated that this sum was Lisa's value. Jim likewise stated that the amount was Lisa's value. Jim then said "[i]f [Lisa] thinks it's worth that, it's worth that . . . . I have a different opinion." Jim also said "[i]f [Lisa] thinks that's what it's worth, then that's what it's worth." Shortly thereafter, Jim again stated that "[t]his was Lisa's value; it's not my value." Given the record, we could hardly conclude that Jim clearly admitted that Dale's valuation of the company was correct. Jim did not testify that he agreed to be bound by Dale's valuation or that he agreed that he

11

would not call any other expert witness to opine on the company's value.

Lisa also argues that Jim failed to preserve error for appellate review because he never made an offer of proof during trial as to what Abraham's testimony would have been. To preserve error on the ground that the trial court improperly excluded the testimony of a witness, a party must inform the trial court of the substance of the testimony by an offer of proof, unless the substance was apparent from the context. *See* Tex. R. Evid. 103(a)(2); *Gipson-Jelks v. Gipson*, — S.W.3d—,—, No. 14-13-00967-CV, 2015 WL 3424714, at *4 (Tex. App.— Houston [14th Dist.] May 28, 2015, no. pet. h.). The trial court told Jim's counsel during trial that the court would not allow Jim to do a question-and-answer offer of proof in open court, and the court suggested that Jim should submit a written bill of exception. Jim later filed a written bill of exception. The written bill contained appraisal reports by Abraham and also an affidavit by Abraham, but Lisa asserts that this bill of exception did not comply with the requirements for formal bills of exception. *See* Tex. R. App. P. 33.2.

In any event, at the time the trial court excluded Abraham's testimony, Abraham's expert report had been filed with the trial court. During Lisa's objection to Abraham's testimony, she stated that Abraham would be testifying as to what he thinks Stearns Pools is worth. In response to Lisa's objection, Jim's counsel stated that Jim wanted Abraham to be allowed to testify regarding Abraham's appraisal of Stearns Pools. Given the context, we conclude that Jim either sufficiently informed the trial court of the substance of Abraham's testimony or the substance of this testimony was apparent from the context. *See* Tex. R. Evid. 103(a)(2).

On this record, we conclude that the trial court abused its discretion by preventing Abraham from testifying regarding his appraisal of the company's

value. *See Reid Road Mun. Util. Dist. No. 2 v. Speedy Stop Food Stores, Ltd.*, 337 S.W.3d 846, 855–58 (Tex. 2011) (holding trial court erred in excluding an appraiser's testimony from the summary-judgment evidence). For the trial court's exclusion of Abraham's testimony to constitute reversible error, Jim must show that the error probably caused the rendition of an improper judgment. *See State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009). The Supreme Court of Texas has recognized the impossibility of prescribing a specific test to determine whether a particular error is harmful. *Id*. The high court entrusts that determination to the sound discretion of the reviewing court. *Id*. In making this determination, we must review the entire record. *Id*. Jim need not prove that "but for" the exclusion of evidence, a different judgment necessarily would have resulted. *See id*. Rather, he must show only that excluding the evidence probably caused the rendition of an improper judgment. *See id*. The role that the excluded evidence plays in the context of the trial is also important. *Id*. Thus, the exclusion is likely harmless if the evidence was cumulative, or the rest of the evidence was so one-sided that the error likely made no difference in the judgment. *Id*. But, if erroneously excluded evidence was crucial to a key issue, the error is likely harmful. *Id*.

Lisa argues that any error was harmless because the trial court admitted Jim's inventory and appraisement into evidence and in that document Jim asserts that the value of the company is approximately $1.6 million. But, Jim is not an expert, and this document is merely a statement of Jim's position on this issue. Because the trial court disallowed Jim's expert, there was no expert testimony regarding any value of the company other than Dale's testimony regarding his valuation.

The value of Stearns Pools was a key issue in the bench trial, and the trial

13

court adopted Dale's valuation, which was more than a million dollars less than Abraham's valuation. Under the applicable standard of review, we conclude that Jim has shown that the trial court committed error in excluding Abraham's testimony and that this error probably caused the rendition of an improper judgment. *See id*. at 870–74. We further conclude that this error affects part, but not all, of the matters in controversy at the bench trial, and that the determination of the value of Stearns Pools is separable from the other factual issues tried during the bench trial without unfairness to the parties. *See* Tex. R. App. P. 44.1(b). Therefore, we sustain Jim's ninth through thirteenth issues to the extent that Jim argues the trial court reversibly erred in excluding Abraham's testimony. We reverse the trial court's decree and remand for a new bench trial as to the value of Stearns Pools.

### C. Did the trial court reversibly err in failing to render judgment in Jim's favor based on Lisa's failure to pay amounts ordered under temporary orders and share of rents from community properties?

In his fourteenth issue, Jim asserts that the trial court reversibly erred in failing to give Jim a money judgment or other credit for monies Lisa should have paid to him from Stearns Pools based on the trial court's temporary orders. Under these orders, the trial court ordered that Lisa, as President of Stearns Pools, was "specifically authorized to pay" Jim temporary support in the amount of $2,800 per month until further order of the court. Likewise, the trial court ruled that Lisa, as President of Stearns Pools, was "specifically authorized to pay" Lisa temporary support in the amount of $2,800 per month until further order of the court. In part of her testimony at the bench trial, Lisa stated that the trial court ordered her to pay Jim $2,800 per month. She testified that she and Jim discussed with counsel altering the amount of money Stearns Pools was paying to Jim, and that when she and Jim decided not to "comply with the 700 a week," they were not ignoring the

trial court. Later in her testimony, Lisa read the language of the temporary orders and stated that she was authorized to pay Jim and that she paid Jim without being ordered to do so.

Jim did not assert any claim in his pleadings against either Stearns Pools or Lisa seeking to recover amounts that allegedly were ordered to be paid to Jim under the temporary orders but were not paid. Jim has not shown that the trial court abused its discretion by failing to give Jim a money judgment or other credit for monies Lisa should have paid to him from Stearns Pools based on the trial court's temporary orders or in allegedly not considering the failure to make these payments in rendering the divorce decree. *See Smith v. Grayson*, No. 03-10-00238-CV, 2011 WL 4924073, at *8 (Tex. App.—Austin Oct. 12, 2011, pet. dism'd) (mem. op.). Accordingly, we overrule Jim's fourteenth issue.

In his fifteenth issue, Jim asserts that the trial court reversibly erred in failing to give Jim a money judgment or other credit for rents and revenues Lisa received from community rental properties. Jim argues that the trial court erred in denying his reimbursement claim based on these rents and revenues and in failing to consider these rents and revenues in the just and right division of the community property. Jim did not assert any claim in his pleadings against Lisa seeking a judgment or a credit for rents and revenues Lisa received from community rental properties. Nor does Jim cite any evidence from trial showing what happened to these rents and revenues after they were received. In the division of community property, Jim received some accounts and Lisa received other accounts. Jim points to no testimony showing whether these rents or proceeds were in any accounts Jim received or in any accounts Lisa received. Jim has not shown that the trial court abused its discretion by failing to give Jim a money judgment or other credit for rents and revenues Lisa received for community rental properties or in allegedly

15

failing to consider these rents and revenues in the just and right division of the community property. *See Grayson*, 2011 WL 4924073, at *8. Therefore, we overrule Jim's fifteenth issue.

### D. Did the trial court abuse its discretion in sanctioning Jim for failing to appear personally at a mediation?

In Jim's sixteenth issue he asserts that the trial court abused its discretion by sanctioning him $4,800 based on his failure to appear personally at a court-ordered mediation. Jim argues that the trial court abused its discretion in assessing these sanctions because (1) Jim moved for a stay of the proceedings under the Servicemembers Civil Relief Act[7]; (2) when the mediation occurred Jim was on active duty in the United States Army, and Jim's military service precluded him from attending the mediation; and (3) the evidence is legally and factually insufficient to support a sanction amount greater than $2,400.[8] We note that in an agreement filed with the trial court under Texas Rule of Civil Procedure 11, Jim agreed that he would not seek a stay of this case under the Servicemembers Civil Relief Act. Though Jim does not expressly assert that the trial court erred in denying his motion for a stay of the proceedings under the Act, we presume, for the sake of argument, that Jim has assigned error on this point and has presented sufficient argument in support of the proposition that the trial court erred in granting Jim's motion for a stay.

After the trial court ordered the parties to mediation, but before a date was set, Lisa filed a motion seeking a court order that Jim appear personally at the mediation. In that motion, Lisa asserted that Jim wanted to participate by

---

[7] *See* 50 App. U.S.C. § 501, *et seq*.

[8] Jim has not asserted that the evidence is legally or factually insufficient to support a sanctions amount of $2,400 or less, nor has Jim presented any argument in support of such an assertion.

telephone in the mediation and in his deposition, rather than appearing personally. Lisa stated that every time an event in the case requires Jim's direct participation, Jim claims he cannot participate because he is serving in the military and that Jim does so to avoid his responsibilities as a litigant in the case. The trial court granted Lisa's motion and ordered Jim to appear personally at a mediation in Richmond, Texas, on November 21, 2011 (the "First Mediation"). Jim's deposition was set for the day after this mediation.

A week before the date for the First Mediation, Jim filed a motion for continuance or motion to stay proceedings. Jim asserted that he was on active duty in the United States Army in Hawaii and that he was not allowed to leave his post without at least thirty days' notice. Jim stated that he would not be able to attend the mediation or deposition the following week. Jim requested that the mediation and deposition be reset so that he could give the necessary notice to his superiors and obtain leave to travel to Texas for the mediation and deposition. Jim also asked for a stay of the proceedings under the Servicemembers Civil Relief Act "until either the period between the Thanksgiving and Christmas holidays or anytime following the New Year's Day holiday." According to Jim, his commanding officer would allow him to return to Texas during this time period if Jim gave thirty days' prior notice. *See* 50 App. U.S.C. §§ 521, 522. In the alternative, Jim stated that he was "more than willing" to participate in the mediation and deposition by telephone. The only evidence Jim submitted in support of this motion was an unsworn letter from him. Jim did not offer affidavits or other statements from his commanding officer or other military supervisor.

At a hearing four days later, no evidence was presented, and the trial court again ordered that Jim personally attend the mediation, implicitly denying Jim's motion for continuance and motion to stay the proceedings. Later that day, Jim

filed a second motion to stay the proceedings. In this motion for stay, Jim made arguments similar to those he made in his first motion for stay, except that instead of attaching his own unsworn letter, Jim attached a letter written on his behalf by a "military legal assistance attorney." The author of this letter stated that Jim had informed him that Jim would not be able to attend the mediation or appear personally at the deposition. The author stated that Jim was "more than willing" to participate in a mediation and deposition by telephone or "some other remote means." Though the author of the letter stated that Jim's inability to attend could be supported by a copy of his orders, Jim did not submit a copy of his orders.[9] Jim never submitted any sworn evidence in support of his assertions that he was unable to personally attend the mediation and deposition, nor did he submit any document from any other person with personal knowledge of the situation.

Jim did not appear personally at the mediation on November 21 or the deposition on November 22. But, Jim did appear two weeks later, and he personally participated in the mediation (the "Second Mediation") and deposition at that time. Lisa sought sanctions against Jim for failing to appear personally at the First Mediation. Counsel for Lisa and Stearns Pools represented to the trial court at the hearing that each party had to pay a $1,200 mediation fee for the First Mediation, which did not take place due to Jim's unexcused absence. The trial court announced in open court that it was granting sanctions against Jim in the amount of $1,200. The trial court later signed a sanctions order in which the amount of the sanctions was $2,400.

At the bench trial, Jim initially testified on direct examination that it was impossible for him to have personally attended the First Mediation and deposition.

---

[9] We presume for the sake of argument that Jim timely obtained an adverse ruling on his second motion for a stay under the Servicemembers Civil Relief Act.

He then stated that, if he "absolutely wanted" to attend, he could have, but that he did not pursue this course because it would have required other servicemembers who were vacationing with their families to return to Hawaii. After trial, the trial court's sanctions order was superseded by the final divorce decree, in which the trial court ordered Jim to pay sanctions in the amount of $4,800.

Though the Servicemembers Civil Relief Act should be liberally construed and applied to accomplish its purposes, the statute should not be used as a device to delay the proper and expeditious determination of legal proceedings when the rights of the party in military service will not be materially affected thereby. *See Womack v. Berry*, 291 S.W.2d 677, 681–82 (Tex. 1956); *Power v. Power*, 720 S.W.2d 683, 684 (Tex. App.—Houston [1st Dist.] 1986, writ dism'd). The trial court has wide discretion in determining whether to grant a stay under the statute in light of the circumstances of a particular case; the trial court also has discretion in deciding which party should carry the burden of proof. *See Womack*, 291 S.W.2d at 682; *Power*, 720 S.W.2d at 684.

Two different sections of the Servicemembers Civil Relief Act provide for a stay of proceedings. *See* 50 App. U.S.C. §§ 521(d), 522(b). The stay procedure in section 521 of the statute applies to "any civil action or proceeding . . . in which the defendant does not make an appearance." *Id.* § 521(a), (d). Jim filed an original answer and counterpetition for divorce more than two and a half years before he first sought a stay under the statute. Jim had ample opportunity to seek a stay under section 522. Under section 521's unambiguous language, we conclude that it does not apply to either of Jim's motions for a stay. *See id.* To the extent Jim based either of his stay motions on section 521 of the Servicemembers Civil Relief Act, the trial court did not abuse its discretion in denying either of the motions. *See id.*; *Power*, 720 S.W.2d at 684–85.

19

Section 522 applies to Jim's motions for a stay. *See* 50 App. U.S.C. § 522(a). The trial court must grant a motion for a stay under section 522 if the movant satisfies the following statutory conditions:

An application for a stay . . . shall include the following:

(A) A letter or other communication setting forth facts stating the manner in which current military duty requirements materially affect the servicemember's ability to appear and stating a date when the servicemember will be available to appear.

(B) A letter or other communication from the servicemember's commanding officer stating that the servicemember's current military duty prevents appearance and that military leave is not authorized for the servicemember at the time of the letter.

50 App. U.S.C. § 522(b). Under the plain text of this statute, a trial court has discretion to deny a stay if the movant fails to include a letter or other communication from the movant's commanding officer stating that the movant's current military duty prevents appearance and that military leave is not authorized for the movant at the time of the letter. *See id*.; *In re Walter*, 234 S.W.3d 836, 837 (Tex. App.—Houston [14th Dist.] 2007, orig. proceeding).

Jim did not submit to the trial court anything from his commanding officer regarding his ability to attend the mediation or deposition. Therefore, to the extent Jim based either of his stay motions on section 522, the trial court had discretion to deny the motions. *See* 50 App. U.S.C. § 522; *In re Walter*, 234 S.W.3d at 837. Though Jim submitted two unsworn letters in support of the proposition that Jim's military service precluded him from attending the First Mediation, one letter was written by Jim and the other was written by a "military legal assistance attorney" based on Jim's statements regarding the situation. The trial court impliedly determined that Jim had the burden of proof as to whether his military-duty

20

requirements materially affected his ability to appear personally at the mediation. *See Power*, 720 S.W.2d at 684–85. The trial court acted within its discretion by impliedly discrediting the proof that Jim submitted in support of his motions and in impliedly concluding that Jim failed to satisfy the burden of proof. *See In re Walter*, 234 S.W.3d at 837; *Power*, 720 S.W.2d at 684–85. Therefore, to the extent Jim based either of his stay motions on section 522 of the Servicemembers Civil Relief Act, the trial court did not abuse its discretion in denying either of the motions. *See* 50 App. U.S.C. § 522(a); *In re Walter*, 234 S.W.3d at 837; *Power*, 720 S.W.2d at 684–85.[10]

We review for an abuse of discretion the trial court's decision to sanction Jim $4,800 for violating the trial court's order to appear personally at the First Mediation. *See Cire v. Cummings*, 134 S.W.3d 835, 838 (Tex. 2004). The test for an abuse of discretion is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action, but whether the court acted without reference to any guiding rules and principles. *See id*. at 838–39. The trial court's ruling should be reversed only if it was arbitrary or unreasonable. *See id*. at 839.

The record reflects that the trial court ordered Jim to appear personally at the First Mediation and that Jim failed to do so. Though Jim submitted two unsworn letters in support of his assertion that military service precluded him from attending the mediation, it was within the trial court's discretion to discredit these letters. *See id*. at 838–39. Jim's testimony at the bench trial indicated that he could have obtained permission to personally attend the mediation, though,

---

[10] In a Rule 11 agreement filed with the trial court more than a year before the mediation, Jim agreed that he would not seek a stay of this case under the Servicemembers Civil Relief Act. We need not and do not address whether this agreement precluded Jim from moving for a stay under the Servicemembers Civil Relief Act or asserting that sanctions should not be assessed against him because of his military service.

according to Jim, doing so would have required other servicemembers who were vacationing with their families to return to Hawaii. Jim asserts that Lisa did not prove that Jim could have attended the mediation and also fulfilled the duties of his military service. But, Lisa did not have the burden of disproving Jim's proffered reason for violating the trial court's order. *See Basaldua v. Forest Woods Subdivision Prop. Owners Ass'n*, No. 04-11-00716-CV, 2012 WL 2583911, at *4–5 (Tex. App.—San Antonio July 5, 2012, pet denied) (mem. op.). The trial court acted within its discretion by impliedly discrediting Jim's evidence in support of the proposition that Jim's military service precluded him from attending the mediation. *See Cire*, 134 S.W.3d at 838–39; *Basaldua*, 2012 WL 2583911, at *4–5. Thus, the trial court did not abuse its discretion in sanctioning Jim for violating the trial court's order to appear personally at the mediation. *See Cire*, 134 S.W.3d at 838–39; *Basaldua*, 2012 WL 2583911, at *4–5.[11]

Jim also challenges the amount of the sanctions, asserting that the evidence is legally insufficient to support a sanction amount greater than $2,400. In the divorce decree the trial court ordered Jim to pay $2,400 to Lisa and $2,400 to Stearns Pools. Each amount appears to be the aggregate of all mediation fees paid by each of these parties, including the fees for the mediation at which Jim appeared personally. On appeal, Lisa concedes that the correct amount of the sanctions should be $2,400: $1,200 to Lisa and $1,200 to Stearns Pools, based upon the mediation fee each paid at the First Mediation, at which Jim did not appear. We conclude that the trial court abused its discretion to the extent it sanctioned Jim in

---

[11] Jim has not presented argument in support of a challenge to the sufficiency of any findings in the trial court's sanctions order or to the sufficiency of the evidence supporting the trial court's exercise of its inherent power to sanction Jim based on his violation of a court order requiring his personal attendance at a mediation. *See Ezeoke v. Tracy*, 349 S.W.3d 679, 686 (Tex. App.—Houston [14th Dist.] 2011, no pet.). Therefore, we do not address either of these issues on appeal.

an amount greater than $2,400.

For the foregoing reasons, we sustain Jim's sixteenth issue to the extent Jim asserts that the trial court abused its discretion in sanctioning Jim in an amount greater than $2,400.[12] We overrule the remainder of Jim's sixteenth issue.

## III. CONCLUSION

The trial court reversibly erred in granting a directed verdict at the close of Lisa's case-in-chief. This error affects all of the matters in controversy at the jury trial, and the characterization issue regarding the 490,000 shares is not separable from the characterization issue regarding the 510,000 shares without unfairness to the parties. The trial court also reversibly erred in excluding Abraham's testimony during the bench trial. This error affects part, but not all, of the matters in controversy at the bench trial, and the determination of the value of Stearns Pools is separable from the other factual issues tried during the bench trial without unfairness to the parties. The trial court did not err in denying either of Jim's motions for a stay under the Servicemembers Civil Relief Act. Nor did the trial court abuse its discretion in sanctioning Jim for violating the trial court's order to appear personally at the mediation. Even so, the trial court abused its discretion to the extent it sanctioned Jim in an amount greater than $2,400.

Based on our disposition of the issues, we render judgment as follows:

(1) We affirm the trial court's grant of divorce and dissolution of the

---

[12] In the final divorce decree, the trial court appears to order Jim to pay the $4,800 in mediation fees both as sanctions and as part of the trial court's division of the parties' community estate. On appeal, Jim has not presented argument in support of a challenge to the trial court's order that Jim pay the $4,800 in mediation fees as part of the trial court's division of the parties' community estate, and we do not address this issue. In any event, as a remedy for other error that we found above, this court is reversing the decree and remanding for further proceedings. These proceedings on remand are described below and include another just and right division of the community estate.

23

marriage;

(2) We reverse the remainder of the divorce decree and remand for further proceedings in accordance with this opinion, including

(a) a new jury trial as to the characterization of all one million shares of Stearns Pools stock,

(b) a new bench trial as to the value of Stearns Pools,

(c) a just and right division of the community estate in light of the jury findings as to the characterization of all shares of Stearns Pools stock, the trial court's new finding as to the value of Stearns Pools, and the trial court's other findings at the first bench trial on issues other than the characterization of the Stearns Pools shares or the value of Stearns Pools, and

(d) rendition of a new divorce decree, which may include a new sanctions order in which the trial court sanctions Jim for failing to appear personally at the court-ordered mediation in an amount not to exceed $1,200 as to Lisa and $1,200 as to Stearns Pools.[13]

/s/     Kem Thompson Frost
Chief Justice

Panel consists of Chief Justice Frost and Justices Christopher and Busby.

---

[13] *See Sprague v. Sprague*, 363 S.W.3d 788, 805 (Tex. App.—Houston [14th Dist.] 2012, pet. denied). Based on our disposition, we need not address Jim's eighth issue or the parts of Jim's other issues that we have not overruled or sustained in this opinion.