**Opinion issued October 7, 2021**



**In The**

# Court of Appeals

**For The**

# First District of Texas

————————————

**NO. 01-19-00734-CV**

————————————

**IN RE COMMITMENT OF LONNIE JAMES, Appellant**

---

**On Appeal from the 208th District Court**
**Harris County, Texas**
**Trial Court Case No. 0579726-0101Z**

---

## MEMORANDUM OPINION

In this case, the State filed a petition seeking to have appellant, Lonnie James, civilly committed under Texas's Sexually Violent Predators Act ("SVP Act" or "the Act"). *See* TEX. HEALTH & SAFETY CODE §§ 841.001–.153. A jury determined that James is a sexually violent predator, and the trial court signed an order of civil commitment.

In three issues on appeal, James contends that (1) the State presented factually insufficient evidence to support the jury's finding that he is a sexually violent predator; (2) the trial court erred by granting the State's motion for partial directed verdict before he rested his case-in-chief; and (3) the trial court erred by refusing to instruct the jury that it could return a verdict in his favor—that is, a verdict that he was not a sexually violent predator—by a 10-2 vote instead of a unanimous vote.

We affirm.

## Background

James has nine convictions for sexually violent offenses. He was convicted of rape in California in 1978, received five years' probation, and was ordered to participate in inpatient sex offender treatment. He was also convicted of rape in Tarrant County in 1984 and was sentenced to confinement for fifteen years. He served approximately five years of this sentence. The complainants for both of these offenses were adults. In 1991, while he was still on parole, James was convicted in Harris County of three counts of aggravated kidnapping and four counts of aggravated sexual assault of a child arising out of three different incidents with four child complainants. The trial court assessed James's punishment at confinement for thirty years for each offense, with the sentences to run concurrently.

In May 2018, as James's confinement for the 1991 convictions was coming to an end, the Harris County District Attorney's Office and the Special Prosecution

Unit filed a petition seeking to have James civilly committed as a sexually violent predator under the SVP Act. The State alleged that James "is a repeat sexually violent offender who suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence" and requested that the trial court commit him for "treatment and supervision."

Three witnesses testified at trial: Dr. Randall Price, a forensic psychologist; Dr. Sheri Gaines, a psychiatrist; and James. Dr. Price and Dr. Gaines both reviewed extensive records, including records describing the details of James's past convictions, and interviewed James. Dr. Price also completed three actuarial measures designed to determine James's level of psychopathy and risk for reoffending and committing another sexually violent offense. Both witnesses testified concerning the facts of each of James's offenses, which they considered relevant in determining whether James has a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. They both testified about risk factors for reoffending that they had identified when reviewing records and interviewing James, as well as protective factors that operate to decrease that risk.

Dr. Price and Dr. Gaines both diagnosed James as having "other specified paraphilic disorder, nonconsensual sex with adults and children" and "other specified personality disorder with antisocial traits." Both experts testified that, in

3

their professional opinion, James has a behavioral abnormality as defined by the SVP Act.

James also testified during both the State's case-in-chief and his own case-in-chief. During the State's case-in-chief, James admitted that he had pleaded guilty to nine sexually violent offenses; that he had been hospitalized for sex offender treatment and then placed on probation after the California offense; that he received a fifteen-year sentence following his conviction of the Tarrant County offense; and that he was currently serving a thirty-year sentence following his conviction of the seven Harris County offenses. Although James admitted, with respect to the Harris County offenses, that he kidnapped three of the four child complainants and that he intended to have sex with these complainants, he denied sexually abusing any of the child complainants. With respect to the California and Tarrant County offenses, James admitted having sex with the two adult complainants but testified that it was consensual. James testified similarly concerning his convictions and his denials of the conduct underlying the convictions during his own case-in-chief.

Before James rested his case-in-chief, the parties and the trial court held an off-the-record discussion concerning several issues, including the jury charge. On the record, James objected to the trial court granting a directed verdict on the first element of the State's burden of proof—whether James was a repeat sexually violent offender because he had been convicted of more than one sexually violent offense

4

and a sentence had been imposed for at least one of the offenses. James argued that resolution of this question was "within the purview of the jury" and that "[a]ny finding on the part of the Court might unfairly bias the jury as to their answering of the second question," whether James has a behavioral abnormality as defined by the SVP Act. The trial court stated, "It's pretty much a foregone conclusion based upon the evidence that no reasonable juror could disagree with the fact that he is a multiple offender and has been sentenced at least once for one of those crimes enumerated in the charge." The following exchange occurred between the trial court and the State:

The State: I just want to make sure the record is clear that we did ask the Court for that directed verdict on the first element.

The Court: I think you could ask for it after the close of evidence here.

The State: Yes.

The Court: But if you are making that request right now, I will grant that.

The State: Yes, Your Honor, we are—we've already rested. I think we are entitled to make a motion at any time—

The Court: I believe so.

The State: —before the jury is instructed, but I will formally ask for that directed verdict at this time.

The Court: All right. That motion is granted as to the directed verdict.

After the trial court granted the partial directed verdict, James briefly continued testifying. He once again acknowledged that he had multiple convictions for sexually violent offenses and denied that he had committed any improper sexual conduct.

5

During the charge conference, James acknowledged that a "yes" verdict under the SVP Act—that is, a verdict that a defendant is a sexually violent predator—must be unanimous, but he argued that the Act does not specifically require that a "no" verdict—that is, a verdict that a defendant is *not* a sexually violent predator—must be unanimous. He therefore requested a "10-2" instruction, or an instruction that the jury could answer "no" to the question whether James is a sexually violent predator by a vote of only ten jurors. The trial court stated that it believed both "yes" and "no" votes should be unanimous, and it refused to give James's requested instruction.

The jury charge contained one question: "Do you find beyond a reasonable doubt that LONNIE JAMES is a sexually violent predator?" The charge instructed the jury that a person is a "sexually violent predator" if the person (1) is a repeat sexually violent offender, and (2) suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence. The charge defined "repeat sexually violent offender" and stated: "The Court has granted a directed verdict that Respondent, LONNIE JAMES, has been convicted of more than one sexually violent offense and a sentence was imposed for at least one of the offenses. Therefore, he is a 'repeat sexually violent offender' as defined above." The charge also instructed the jury to answer "yes" or "no" to the question and stated:

> A "yes" answer must be based on a belief beyond a reasonable doubt.
> If you do not find beyond a reasonable doubt that the evidence supports
> a "yes" answer, then answer "no." Your verdict must be unanimous.
> That means that all twelve of the jurors must agree to the answer.

6

The jury answered "yes" to the question, and the presiding juror certified that the verdict was unanimous.

The trial court signed a civil commitment order under the SVP Act and a final judgment ordering that James is a sexually violent predator and that he is to be civilly committed. James filed a motion for new trial, which was overruled by operation of law. This appeal followed.

**Factual Sufficiency of Evidence**

In his first issue, James argues that the State failed to present factually sufficient evidence to support the jury's finding that he is a sexually violent predator.[1]

---

[1] The State argues that because the burden of proof at trial in SVP cases is beyond a reasonable doubt, factual sufficiency reviews of the evidence in SVP cases should be abolished, as the Court of Criminal Appeals has done in criminal cases. *See, e.g.*, *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (holding that *Jackson v. Virginia* standard is only standard appellate court should apply in determining whether evidence is sufficient to support each element of criminal offense beyond reasonable doubt). James argues that we should follow the factual sufficiency analysis that the Fort Worth Court of Appeals conducted in *In re Commitment of Stoddard*. *See* 601 S.W.3d 879, 891–98 (Tex. App.—Fort Worth 2019), *rev'd*, 619 S.W.3d 665 (Tex. 2020). After James and the State had filed their appellate briefs in this case, the Texas Supreme Court granted review and decided *In re Commitment of Stoddard*. In that case, the supreme court expressly declined to abolish factual sufficiency review in SVP cases. *See In re Commitment of Stoddard*, 619 S.W.3d at 676 ("[W]e hold that the 'right of courts of appeals to review for factual sufficiency' under the standard expressed herein 'must continue undisturbed.'") (quoting *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 634 (Tex. 1986)). The court also held that the factual-sufficiency analysis conducted by the intermediate court in *Stoddard* did not comport with the appropriate appellate standard of review. *Id.* at 678. We therefore follow the Texas Supreme Court's guidance in *Stoddard* and conduct a factual

## A.      *Standard of Review*

A person is a sexually violent predator under the SVP Act if the person (1) is a repeat sexually violent offender, and (2) suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence. TEX. HEALTH & SAFETY CODE § 841.003(a). A person is a repeat sexually violent offender if the person is convicted of more than one sexually violent offense and a sentence is imposed for at least one of the offenses. *Id.* § 841.003(b); *id.* § 841.002(8) (defining "sexually violent offense" to include offense for aggravated sexual assault of child and aggravated kidnapping "if the person committed the offense with the intent to violate or abuse the victim sexually"). The SVP Act defines "behavioral abnormality" as "a congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." *Id.* § 841.002(2). The Act defines "predatory act" as "an act directed toward individuals, including family members, for the primary purpose of victimization." *Id.* § 841.002(5). The factfinder shall determine whether, beyond a reasonable doubt, the person is a sexually violent predator. *Id.* § 841.062(a).

---

sufficiency review of the evidence under the standards articulated by the supreme court.

A commitment proceeding under the SVP Act is the "unusual civil case incorporating the 'beyond a reasonable doubt' burden of proof typically reserved for criminal cases." *In re Commitment of Stoddard*, 619 S.W.3d 665, 674 (Tex. 2020). The burden of proof at trial "necessarily affects appellate review of the evidence." *Id.* (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). Regardless of the burden of proof at trial, however, "the jury remains 'the sole judge of the credibility of witnesses and the weight to be given to their testimony.'" *Id.* (quoting *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003)).

A factual sufficiency review "is premised on consideration of the entire record." *Id.* In *Stoddard*, the Texas Supreme Court stated:

> The assumption that the factfinder resolved disputed evidence in favor of the finding if a reasonable factfinder could do so remains. However, rather than "disregard" disputed evidence that a reasonable factfinder could not have credited in favor of the finding, the court must determine whether, in light of the entire record, that evidence "is so significant that a factfinder could not reasonably have formed a firm belief or conviction" that the finding was true. By logical extension, in an SVP case where the burden of proof is beyond a reasonable doubt, the evidence is factually insufficient if, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the SVP finding, along with the undisputed facts that do not support the finding, is so significant that the factfinder could not have found beyond a reasonable doubt that the statutory elements were met.

*Id.* at 674–75 (quoting *J.F.C.*, 96 S.W.3d at 266). Mere disagreement with the jury as to the proper evidentiary weight and credibility of the evidence cannot be the basis

of a reversal on factual insufficiency grounds. *Id.* at 677. We may not substitute our judgment for that of the jury. *Id.*

Thus, the appellate standard for conducting a factual sufficiency review of a finding that a person is a sexually violent predator "is whether, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of the verdict, along with undisputed facts contrary to the verdict, is so significant that the factfinder could not have found beyond a reasonable doubt that the statutory elements were met." *Id.* at 678. If we reverse for factual insufficiency, we must "detail why [we have] concluded that a reasonable factfinder could not have credited disputed evidence in favor of the finding." *Id.*

## B. *Trial Testimony*

Dr. Randall Price is a forensic psychologist and licensed sex offender treatment provider, and he is board certified in forensic psychology and clinical neuropsychology. After reviewing the relevant records (including police reports and prison records), interviewing James, reviewing the depositions of James and Dr. Gaines, and scoring relevant actuarial measures designed to assist in determining an individual's risk of reoffending, Dr. Price concluded that James has a behavioral abnormality as defined in the SVP Act that makes him likely to engage in a predatory act of sexual violence. Dr. Price relied on James's sexual offending history in arriving at this opinion, and he discussed this history with James during their

10

interview. James has a total of nine sex-related convictions. The facts underlying each of these convictions were relevant to Dr. Price's opinion, and he testified concerning the facts of each offense.

James's first sex offense occurred in San Diego in 1976, when James was twenty-one years old. James was acquainted with the complainant, a twenty-one-year-old neighbor, who he had met approximately one month before the sexual assault occurred. A week after the complainant had a baby, James stopped by her house and asked to use her phone. She invited him inside and allowed him to see her new baby. James then physically and sexually assaulted her, threatened her life and that of the baby, and then left. James pleaded guilty to the offense of rape in 1978, and he was placed on probation for five years and ordered to a state hospital for eighteen months for sex offender treatment, anger management treatment, and alcohol abuse treatment. During his interview with Dr. Price, James stated that he "thought it was consensual at the time."

After being released from sex offender treatment in California, James moved to Tarrant County, Texas. His next sex offense occurred there in 1983, approximately two years after he completed probation for the California offense. James, who was around twenty-eight at the time, followed a twenty-five-year-old neighbor up the stairs to her apartment, pushed her inside, dragged her by her hair to the bedroom, hit her in the head, and sexually assaulted her. James pleaded guilty

11

to the offense of rape in 1984, and he received a fifteen-year sentence. He served nearly five years of this sentence before being paroled in 1988. When asked about this offense, James told Dr. Price that "it was consensual." Dr. Price testified that James had not accepted responsibility for either of these offenses because "[h]e maintains they are consensual." Dr. Price considered this offense significant because it occurred after his conviction for the California offense, indicating that his conviction and the treatment he received following the first offense "did not lead to him controlling his urges." He testified that James "reoffended in spite of treatment and sanction; and that is significant in the risk he poses."

James was still on parole for this second offense when the next sex offenses—the ones for which he was incarcerated at the time of this SVP proceeding—occurred in Harris County in 1990. In January 1990, James, who was thirty-five years old, was dating a woman who had a six-year-old niece and two-year-old nephew living with her. James dropped his girlfriend off at work and, while still parked in the parking lot, forced his girlfriend's niece to perform oral sex on him. James pleaded guilty to the offense of aggravated sexual assault of a child, and the trial court assessed his punishment at confinement for thirty years. During his interview with Dr. Price, James denied having any kind of sexual contact with this complainant.

The day after the assault on his girlfriend's niece, James abducted two girls—a five-year-old girl and her three-year-old sister—who lived in the same apartment

12

complex as people he knew. The girls waved to James from a window in their apartment, and he pulled them through the window and drove them to a local motel where he forced them to perform oral sex on them and attempted vaginal intercourse with them. James pleaded guilty to two counts of aggravated kidnapping and two counts of aggravated sexual assault of a child, and the trial court assessed his punishment at confinement for thirty years for each count, to run concurrently. The indictments for the aggravated kidnapping offenses alleged that James kidnapped both girls with the intent "to violate and abuse the [complainants] sexually." During his interview with Dr. Price, James admitted to kidnapping these girls and taking them to a motel. He told Dr. Price, "My intent was to have sex with them," but he denied having sex with the girls. He further stated that he "took them back close to their home and let them out" of his car.

Eight days after he sexually assaulted the two sisters, James kidnapped and assaulted an eight-year-old girl who he did not know. While driving, James saw this complainant walking along the side of the road and he asked her if she had seen his daughter.[2] James stopped at a park and forced her to perform oral sex on him. They spent the night in his car, and then James took her to a motel where he again forced her to perform oral sex and had vaginal intercourse with her. James dropped her off on the side of the road and told her someone would give her a ride home. James

---

[2] James does not have a daughter.

pleaded guilty to the offenses of aggravated kidnapping and aggravated sexual assault of a child, and the trial court assessed his punishment at confinement for thirty years for both offenses, to run concurrently.

During his interview with Dr. Price, James stated that he "was under a lot of stress about his ex-girlfriend" and acknowledged taking this complainant to a motel. James at first told Dr. Price that he "never thought about having sex like that," but then he admitted that this complainant "gave [him] oral sex one time." In his deposition, James denied any kind of sexual contact with this complainant. Dr. Price testified that the fact that this complainant was a stranger to James was significant because when the victim is a stranger "that represents more of a risk for sexually reoffending than if the offender knows the victim" because it is "usually a lot harder to gain access to the victim" and it "increases the potential pool of victims in the future." Dr. Price testified that James has accepted "at least some responsibility for this."

Dr. Price defined "sexual deviance" as "abnormal sexual behavior," and he stated that James is sexually deviant because he "has an interest and is aroused by nonconsensual sex by having sex with a victim that doesn't want to." Dr. Price used the Diagnostic and Statistical Manual, Fifth Edition, to diagnose James with "other specified paraphilic disorder," specifically "nonconsensual sex with both adults and

14

children."[3] He testified that sexually assaulting women and any kind of sexual conduct with children qualifies as sexually deviant acts. He testified that there was some evidence that James still had this interest because he had reported to Dr. Gaines that, while in the hospital in 2006 after having a prostatectomy, he saw a movie that depicted a sexual assault and this aroused him. Dr. Price testified that paraphilic disorder is a chronic condition that cannot be cured, only managed.

Dr. Price also diagnosed James with "other specified personality disorder" with traits of antisocial personality disorder. A personality disorder is a "pervasive and chronic" set of traits or behaviors that are dysfunctional and cause problems for either the person or other people. He defined "antisocial" in this context as "a set of traits and behaviors that are not pro social" and are not "in tune with or consistent with the basic values of our society." James has several antisocial traits, including "a failure to conform to social norms with respect to lawful behaviors," "an element of conning of others," "a reckless disregard for the safety of others," and a lack of remorse, as demonstrated by his denial of the offenses. Dr. Price did not diagnose James with antisocial personality disorder because that diagnosis requires evidence of a conduct disorder prior to age fifteen, and he did not have any evidence that

---

[3] Dr. Price testified that a diagnosis of pedophilia was not appropriate for James because that diagnosis requires sexual interest in children that persists for at least six months, and that was not present here. There was evidence that James's sexual interest in children "was present and very strong for eight days but not for six months," and James did not self-report a sexual interest in children.

15

James had started acting out prior to that age. According to Dr. Price, there is a consensus in the professional literature that there are "two pathways to being a sex offender": sexual deviance and antisociality. Both are present with James. He agreed that James's sexual offending history is evidence of his personality disorder, stating, "it's persistent of violating the law in spite of the consequences."

As part of his evaluation of James, Dr. Price completed several actuarial measures including the PCL-R, the psychopathy checklist revised. "Psychopathy" is a "clinical construct" that is similar to antisocial personality traits and is related to recidivism. The PCL-R considers twenty psychopathic traits and is scored on a scale from 0 to 40. Dr. Price scored James at 20, which is below the threshold for being considered a psychopath. Compared to other criminal offenders, James "would fall at the 40th percentile which would mean that he's higher than 40 percent of other criminal offenders and, of course, that means that 60 percent are higher than him." Dr. Price did not conclude that James is a psychopath, but he does have some psychopathic traits including lack of remorse, lack of empathy, poor behavioral controls, promiscuous sexual behavior, impulsivity, and failure to accept responsibility. Although many sex offenders exhibit denial about their offenses, James displayed "extreme levels of denial," minimizing his behavior, his motive, or the effect his behavior had on the complainants. An extreme level of denial is a risk factor for reoffending.

Dr. Price also completed the Static-99R, which contains a list of ten risk factors that have been empirically studied in sex offenders and assesses the likelihood of a sex offender to reoffend. It's impossible to predict whether an individual will sexually reoffend in the future, but this actuarial measure "gives us totally objective information that forms a baseline that you then adjust based on the individual." Dr. Price agreed that the Static-99R does not address all factors that are relevant to an individual's risk for reoffending, such as whether an individual commits an offense while on parole, "and it only captures factors that are static, which means they don't change," such as the number of past sex-related offenses. After assessing James, Dr. Price gave him a score of 3 on this measure, which, when compared with other sex offenders, means that James is in the "average range" for reoffending.[4]

After interviewing James, Dr. Price also considered the Risk for Sexual Violence Protocol ("RSVP"), which is a research-based "checklist of other risk

---

[4]     Dr. Price compared James's score to several different groups of sex offenders and considered what percentage of offenders later reoffended, meaning that they were convicted of another sex-related offense. Because "reoffending" is defined only as a later conviction and does not consider unreported sex offenses, the numbers are considered an underestimate of "actual reoffending." In the "routine sample" of sex offenders, on average, 7.9% of offenders with a score of 3 on the Static-99R reoffended within five years. In the "high-risk, high-needs" group of sex offenders, 14% of offenders with a score of 3 reoffended within five years and 22.9% reoffended within ten years. And in the "Texas Norms" group of sex offenders, which has a "very small" sample size, 3.8% of offenders with a score of 3 in Texas reoffended within five years.

factors" that addresses factors known to increase the risk for reoffending. This measure includes some "dynamic factors," including successfully undergoing sex offender treatment and maintaining steady employment, which means it accounts for things that the individual can do to decrease the risk of reoffending. At trial, Dr. Price listed for the jury the risk factors that James possesses, which are covered by the Static-99R, the RSVP, and other clinical research: he had never lived with a partner for two years;[5] nonsexual violence associated with the last offense; pattern of reoffending; having unrelated victims; having strangers as victims; chronic sexual violence spanning a long time period; diverse forms of sexual assault; escalation of sexual offenses; use of physical coercion; use of psychological coercion; extreme denial of sexual offending; attitudes that support or condone sexual violence; problems with stress or coping; sexual deviance; problems with substance abuse; problems with intimate relationships; employment history; reoffending while on parole; reoffending after sex offender treatment; violating community supervision by committing a new offense; alcohol use during at least one offense; deficient acceptance of responsibility; deficient victim empathy; and choice of victims from a wide age range.

---

[5]    Dr. Price did not recall whether James reported that he had lived with a partner for two-and-a-half years. He agreed that if James had done so, that would reduce his score on the Static-99R from a 3 to a 2. James testified that, before moving to Texas, he lived with a partner for around two-and-a-half years.

Balanced against an individual's risk factors are the individual's protective factors, or "anything that tends to decrease the risk of reoffending." James's protective factors included his age (sixty-four at the time of trial); poor medical health; good adjustment to incarceration, including no sexual offenses while in prison;[6] he obtained college degrees while incarcerated; lack of a male victim; no major mental illnesses; he is not "a prototypical psychopath"; he does not meet all criteria for antisocial personality disorder; he has "[a] fairly reasonable plan for his release," involving seeking acceptance into a program for homeless veterans; he has a reported low sex drive and a reported lack of interest in sex at all; and he has an accepting attitude towards sex offender treatment for sex offenders. At times, James acknowledged to Dr. Price that he needs sex offender treatment, but other times he said that he did not. He also told Dr. Price that he did not consider himself to be a sex offender. When balancing the risk factors and protective factors, Dr. Price opined that James had a "moderately high" risk for sexual reoffending.

Dr. Price also considered James's medical and substance abuse history. He considered James's past alcohol abuse significant because alcohol use can lower the

---

[6]   Dr. Price testified that the fact that James has had no sexual offenses while in prison does not change his ultimate opinion because prison is a "[t]otally different situation than being in the free world." Although women can be on prison staff, no children are present in prison, and the environment is highly structured and under near-constant surveillance, which can "curtail and inhibit assaultive behavior of a sexual variety in thousands of inmates," although sexual assaults do still occur in prison.

individual's inhibitions and behavioral control and can increase "the chances of acting out on some predisposition that they might have that leads to reoffending." While James was hospitalized in California and while incarcerated for his first conviction in Texas, he participated in substance abuse treatment. He also has a conviction for driving while intoxicated, and the records that Dr. Price reviewed indicated that James had been drinking during the 1976 offense and around the time of the 1990 offenses. Dr. Price considered James's diagnosis of prostate cancer and the subsequent removal of his prostate in 2006, but this did not change his opinion that James has a behavioral abnormality that makes him likely to reoffend because the prostate "is not physiologically involved with sex drive." He also considered James's knee problems, which makes his gait unsteady and decreases his mobility, but this did not change his opinion because "you don't need to have a lot of mobility to commit some sex offenses" and some of James's offenses involved him "sexually offending with his hand."

Dr. Sheri Gaines, a psychiatrist, also reviewed relevant records, interviewed James, and evaluated him. Dr. Gaines did not score any actuarial measures herself, but she used the scores completed by Dr. Price as part of the basis for her opinion. Dr. Gaines, like Dr. Price, opined that James has a behavioral abnormality as defined by the SVP Act.

Dr. Gaines considered the facts of each of James's offenses when reaching her conclusion. With respect to the California offense, the fact that it occurred a long time ago "shows a pattern of behavior, that shows behavior that persisted throughout decades." She also considered the physical violence, the verbal threats that James made to this complainant, and the fact that this complainant was a young adult, as opposed to the child complainants for James's most recent convictions. Although James completed sex offender treatment after this offense, he later reoffended, which is a risk factor for future reoffending. With respect to the Tarrant County offense, Dr. Gaines testified that many of the risk factors from the first offense were present with this offense, as well as a "lack of insight and the denial, saying that it was consensual," and a lack of remorse and callousness towards the complainant.

With respect to the 1990 offenses, Dr. Gaines identified several facts that were relevant to her opinion, including the age of the complainants contrasted with James's first two offenses, a pattern of behavior, "the escalation of the offenses and even a spree of these last seven convictions," three of the complainants were strangers to James, parts of some of the offenses occurred in a public place, and the kidnapping constituted an "additional offense." James admitted that he kidnapped three of the children, but he never admitted to Dr. Gaines that he had committed any sex crimes. She testified that this was significant because "denial is a risk factor for repeating negative behaviors."

21

Dr. Gaines testified that James's sexual deviancy is "nonconsent, perpetrating sexual acts on nonconsensual victims, adults, and children," and she diagnosed him with "other specified paraphilic disorder, nonconsent with adults and children." She testified that this is a chronic, lifelong condition that "can sometimes be controlled with various kinds of treatment, but it does not go away on its own." She stated that this disorder has affected James's volitional capacity because he has "been unable to abide by laws or ethical rules or rules of society," and he continues to have risk factors, "including the denial of committing the offenses." Dr. Gaines also diagnosed James with "[o]ther specified personality disorder with antisocial traits." The "antisocial component" of this disorder for James is his pattern of illegal behavior, a lack of remorse, denial, and deception. She also considered James's past history with alcohol abuse as a risk factor, and she testified that it was "concerning" that James does not believe that he needs treatment for substance abuse.

During her interview with James, Dr. Gaines asked him if he needed sex offender treatment, and he stated that he did not believe that he needs it. She stated that James had "poor insight" into his paraphilic disorder, he does not understand why he sexually offended, and he does not exhibit empathy or remorse for his victims. He acknowledged that when he kidnapped the child complainants he intended to have sex with them, but he could not explain what led to this thought. This also concerned Dr. Gaines because "[i]n order to change a problematic

22

behavior, someone has to identify that behavior first . . . and then start working on how to change it."

Dr. Gaines also identified several protective factors for James, including his age because "the literature indicates that after the age of 60, there's a pretty steep decline in reoffending." James's age did not change Dr. Gaines's opinion about likelihood of reoffending "given all these risk factors we've been talking about, the decades of offending." James had also obtained college degrees while in prison and had adjusted well to the prison environment without having many disciplinary issues. He also has family members, friends, and members of his religious community who correspond with him and provide a support system for him. James also has balance and mobility problems, and he reported that his prostate cancer has affected his libido. These factors did not change Dr. Gaines's opinion because neither the ability "to run around from place to place" nor a sex drive is necessary to commit a sexual offense.

James also testified. He acknowledged that he had nine prior convictions for sex-related offenses. The State questioned James about the details of each of these offenses, and although he admitted pleading guilty to these offenses and being convicted of them, he denied sexually assaulting any of the complainants. With respect to the two adult complainants, in California and in Tarrant County, he testified that he had consensual sex with both of them. James also denied sexually

assaulting any of the child complainants in 1990, but he admitted to kidnapping three of the complainants with the intent to have sex with them. He denied being sexually attracted to children.[7] Aside from the court-ordered treatment after his California conviction, James has not participated in sex offender treatment, and he does not believe that he is a sex offender. He denied having a sex drive or thoughts about sex. He also denied having a problem with alcohol abuse.

## C.    *Analysis*

In arguing that the jury's finding that he is a sexually violent predator is not supported by factually sufficient evidence, James relies heavily on the Fort Worth Court of Appeals' analysis in *In re Commitment of Stoddard*, which has since been reversed by the Texas Supreme Court. *See Stoddard*, 619 S.W.3d at 676–78. He also compares many of the facts in this case, such as his scores on the actuarial measures and his lack of unadjudicated sexual offenses, to the facts in *Stoddard* and argues that this Court should, as the Fort Worth Court did, find that the State presented factually insufficient evidence to support the jury verdict.

---

[7]    James offered inconsistent testimony on this matter. When he was questioned by his counsel, James denied being sexually attracted to children and stated that he never told anyone that, when he kidnapped the child complainants, he intended to have sex with them. He testified that that thought did not cross his mind. He stated that he "would not want anybody's kids to go through what I put them through," that his actions were "definitely wrong," and that he "deserved to do these 30 years for what I did." When later asked if he believed he needed sex offender treatment, he stated, "Well, I could use it because I did kidnap the girls with the intent to have sex with them; so there's nothing wrong with having treatment programs to see why I even did that."

When faced with a similar argument, the Texarkana Court of Appeals declined to engage in such a comparison between facts in different cases. *See In re Commitment of Metcalf*, 602 S.W.3d 609, 623 (Tex. App.—Texarkana 2020, pet. denied). The court stated:

> Comparing isolated facts appearing in other reported SVP commitment cases, such as the seriousness of the underlying offenses or scores on risk assessment guidelines and psychopathy checklists, should not be part of [the factual sufficiency] review. First, isolating and comparing individual pieces of evidence unduly emphasizes that evidence while discounting the remaining evidence present in both cases, which is contrary to the factual sufficiency review standard. Further, the evidence presented in other cases was not before the jury in this case, and the factual sufficiency standard of review does not include considering evidence not before the jury.

*Id.*; *see Stoddard*, 619 S.W.3d at 678 (noting that intermediate court had compared Stoddard "to other adjudicated SVPs with predicate offenses and criminal histories that were more sustained and egregious than Stoddard's" and concluded that Stoddard was not "worst of the worst" of sex offenders, but SVP Act does not require State to prove that offender is one of "the worst of the worst" to obtain verdict that individual is sexually violent predator). We therefore consider only the evidence presented before the jury in this case.

The jury heard evidence that James has been convicted of nine sexually violent offenses, and it heard evidence of the details of these offenses. Dr. Price and Dr. Gaines discussed the details of these offenses, which they considered when formulating their opinions on whether James has a behavioral abnormality, and they

25

discussed the risk factors for reoffending that they observed in connection with James's offenses. Among other risk factors, both Dr. Price and Dr. Gaines considered it significant that James committed a new sexual offense in Tarrant County after undergoing sex offender treatment in California and that he committed the 1990 offenses after being paroled following his Tarrant County conviction. James also committed offenses over a period spanning fourteen years, he offended against both women and young children, he used physical violence against the adult complainants, he threatened the complainants, and he engaged in several different sexual acts with the complainants. Both experts also discussed the significance of James's denial of the sexual components of his offenses and his insistence that he is not a sex offender and does not need sex offender treatment. This level of denial, which Dr. Price characterized as "extreme," is a risk factor for reoffending. Both experts diagnosed James as having "other specified paraphilic disorder, nonconsensual sex with adults and children" and "other specified personality disorder with antisocial traits."

Dr. Price discussed the actuarial measures that he scored for James, as well as the shortcomings of those measures and why he believed James had a greater risk for reoffending despite his "average" scores on the measures. The experts agreed that James is not a psychopath. But he did display some psychopathic traits, which combined with his paraphilic disorder and deviant sexual interests concerned Dr.

26

Price. Both Dr. Price and Dr. Gaines acknowledged that James has several "protective" factors that could decrease his risk of reoffending, such as his age and his medical history, but both doctors explained why the existence of the protective factors present here did not change their ultimate opinion that James has a behavioral abnormality as defined by the SVP Act. Both experts also acknowledged that James had adjusted well to prison and did not have any major disciplinary cases or new sexual offenses since being incarcerated in 1991, but they discounted the significance of that as a major protective factor due to the highly controlled and surveilled nature of confinement in prison.

James also testified, and while he acknowledged that he had nine convictions and admitted that he had kidnapped three of the four child complainants, he denied committing any sexual offenses against any of the complainants. He also denied having a sex drive and denied having any thoughts about sex. As the factfinder, it was within the province of the jury to weigh the evidence, judge the credibility of the witnesses' testimony, and resolve any conflicts in the evidence. *See In re Commitment of Williams*, 539 S.W.3d 429, 440–41 (Tex. App.—Houston [1st Dist.] 2017, no pet.); *In re Commitment of Stuteville*, 463 S.W.3d 543, 552 (Tex. App.—Houston [1st Dist.] 2015, pet. denied); *see also Stoddard*, 619 S.W.3d at 668 (stating that, in conducting factual sufficiency review in SVP case, we "may not usurp the jury's role of determining the credibility of witnesses and the weight to be given

27

their testimony"). Additionally, the jury was free to believe all, part, or none of a witness's testimony. *In re Commitment of Mullens*, 92 S.W.3d 881, 887 (Tex. App.—Beaumont 2002, pet. denied). We may not substitute our judgment for that of the jury. *See Stoddard*, 619 S.W.3d at 677.

We presume that the jury resolved any disputed evidence in favor of its finding that James is a sexually violent predator. *See id.* at 668, 674 (stating that we "must presume that the factfinder resolved disputed evidence in favor of the finding if a reasonable factfinder could do so"). The disputed evidence a reasonable factfinder could not have credited in favor of the jury's verdict, along with undisputed facts contrary to the verdict, is not so significant in light of the entire record such that the jury could not have found beyond a reasonable doubt that James is a sexually violent predator. *See id.* at 678. We therefore hold that the State presented factually sufficient evidence to support the jury's finding that James has a behavioral abnormality as defined by the SVP Act and is a sexually violent predator.

We overrule James's first issue.

### Partial Directed Verdict

In his second issue, James contends that the trial court erred by granting the State's motion for a partial directed verdict on whether James is a repeat sexually violent offender before James had rested his case-in-chief.

A civil commitment proceeding under the SVP Act "is subject to the rules of procedure and appeal for civil cases," but if a conflict exists between the SVP Act and the rules of civil procedure, the SVP Act controls. TEX. HEALTH & SAFETY CODE § 841.146(b); *In re Commitment of Talley*, 522 S.W.3d 742, 749–50 (Tex. App.—Houston [1st Dist.] 2017, no pet.). In civil cases generally, a party has a right to a jury trial to determine questions of fact. *In re Commitment of Harris*, 541 S.W.3d 322, 330 (Tex. App.—Houston [14th Dist.] 2017, no pet.). The SVP Act grants a defendant the right to a jury trial. *See* TEX. HEALTH & SAFETY CODE § 841.061(b); *Talley*, 522 S.W.3d at 749. In a jury trial in an SVP case, the jury shall determine whether, beyond a reasonable doubt, the person is a sexually violent predator. TEX. HEALTH & SAFETY CODE § 841.062(a); *Harris*, 541 S.W.3d at 330.

Uncontroverted questions of fact need not be and should not be submitted to the jury for its determination. *Harris*, 541 S.W.3d at 330 (quoting *Clark v. Nat'l Life & Accident Ins. Co.*, 200 S.W.2d 820, 822 (Tex. 1947)). The Texas Rules of Civil Procedure allow for directed verdicts. *See* TEX. R. CIV. P. 268; *see Harris*, 541 S.W.3d at 330 ("A partial directed verdict is a procedure for removing parts of a civil case from the jury when there are no fact issues to resolve."); *Talley*, 522 S.W.3d at 750 (stating that partial directed verdict is "a mechanism for removing parts of a case from the factfinder"); *see also In re Commitment of Perdue*, 530 S.W.3d 750, 753 (Tex. App.—Fort Worth 2017, pet. denied) ("A directed verdict does not violate the

right to a trial by jury because it is a procedure that depends on a trial court's conclusion that there are no issues of fact to be determined.").

In an SVP Act proceeding, "[a]bsent evidence that challenges the evidence that the defendant has been convicted of more than one sexually violent offense and for which a sentence was imposed for one of them, a person's status as a sexually violent offender is a legal determination appropriate for partial directed verdict." *Talley*, 522 S.W.3d at 750. "When undisputed evidence demonstrates that a person is a repeat sexually violent offender, reasonable jurors can make only one finding as to that element—a conclusion that remains true whether the burden of proving the element is by a preponderance of the evidence or beyond a reasonable doubt." *Harris*, 541 S.W.3d at 330. Thus, in SVP Act cases, the trial court may grant a partial directed verdict on the question whether a person is a repeat sexually violent offender when there is no probative evidence raising a fact issue to the contrary. *Id.*; *Talley*, 522 S.W.3d at 750–51 (upholding trial court's directed verdict when defendant admitted to multiple convictions and sentences for sexually violent offenses in requests for admission and at trial and State introduced records establishing prior convictions and sentences, and therefore this element "was conclusively established and not a contested issue for the jury to determine").

James acknowledges the precedent from this Court holding that trial courts may grant partial directed verdicts on the question whether the defendant is a repeat

sexually violent predator, but he argues that the trial court in this case prematurely granted the directed verdict before he had rested his case-in-chief, depriving him of the "full opportunity" to present his case and thus automatically requiring reversal. In support, James cites, among other cases, the Texas Supreme Court's decision in *Tana Oil & Gas Corp. v. McCall*, in which the court stated, "Ordinarily, a directed verdict should not be granted against a party before the party has had a full opportunity to present its case and has rested." *See* 104 S.W.3d 80, 82 (Tex. 2003); *see also Wedgeworth v. Kirskey*, 985 S.W.2d 115, 116–17 (Tex. App.—San Antonio 1998, pet. denied) (stating that purpose of motion for directed verdict is to show trial court that cause of action does not exist and that "[t]his can only be done *after* the plaintiff has had *full opportunity* to present their evidence" and stating that trial court commits reversible error if it grants directed verdict on its own motion before plaintiff has presented all his evidence); *Nassar v. Hughes*, 882 S.W.2d 36, 38 (Tex. App.—Houston [1st Dist.] 1994, writ denied) ("[T]he trial court may properly direct a verdict if no evidence is presented to support the cause of action. However, if done before the plaintiff has presented all his evidence, it is reversible error.").

In *Tana Oil*, two attorneys sued Tana Oil & Gas and claimed that the company, by suing them and their client in another county, had tortiously interfered with their agreement to represent a client in a different suit against the company. *See* 104 S.W.3d at 81. The only actual damages that the attorneys sought "were the value

31

of the time they spent in defending themselves as well as the costs they incurred."

*Id.* The trial court impaneled a jury, but during the testimony of the McCalls' first witness, the court granted Tana Oil's motion for directed verdict. *Id.* at 81–82. The next day, the trial court signed an order granting the directed verdict "because 'as a matter of law, Plaintiffs [the McCalls] have not and cannot establish all the elements of this cause of action, viz., Plaintiffs have neither pled nor demonstrated that Plaintiffs suffered any actual damage or loss.'" *Id.* at 82.

The Texas Supreme Court concluded that even if the McCalls could have proved that Tana Oil tortiously interfered with their relationship with their client, "they would not be entitled to the only damages they claimed." *Id.* The court then noted that a trial court typically should not grant a directed verdict "against a party before the party has had a full opportunity to present its case and has rested." *Id.* The court stated, however:

> [T]he McCalls were not harmed by the trial court's irregular procedure because their action for tortious interference failed not for want of evidence but because proof of all their claims would not have entitled them to the only damages they sought. We emphasize that the McCalls did not merely fail to plead a viable damage claim; rather they affirmatively limited their claim to damages they could not recover as a matter of law.

*Id.* The supreme court ultimately concluded, "In such a situation, the trial court did not err in dismissing the case." *Id.*

32

James argues that the "*Tana Oil* exception" to the general rule of automatic reversal when a trial court grants a directed verdict before the party has finished its case-in-chief applies only when "the opposing party's claim or defense could not be established as a matter of law," "has nothing to do with an assessment of the trial evidence," and has no application to this case. James argues that he was not barred as a matter of law from challenging the repeat-sexually-violent-offender element of the State's burden of proof, but the trial court's granting of a directed verdict on this element in favor of the State before he had rested his case-in-chief "foreclosed any further evidence (including James's testimony)" on this matter. He argues that the proper remedy for the trial court's error is to reverse the judgment and remand for a new jury trial.

The general rule is that a trial court should not render a directed verdict against a party before that party has had a full opportunity to present the party's case and has rested. *Tana Oil*, 104 S.W.3d at 82; *Stearns v. Martens*, 476 S.W.3d 541, 546 (Tex. App.—Houston [14th Dist.] 2015, no pet.); *State Office of Risk Mgmt. v. Martinez*, 300 S.W.3d 9, 11 (Tex. App.—San Antonio 2009, pet. denied). Here, the State moved for a directed verdict on whether James was a repeat sexually violent offender because he had been convicted of more than one sexually violent offense and a sentence was imposed for at least one of the offenses. The trial court granted the directed verdict during James's testimony as part of his case-in-chief. Because

33

the trial court did not wait to grant the directed verdict until after James had rested his case-in-chief, we conclude that the trial court erred. *See Tana Oil*, 104 S.W.3d at 82; *Stearns*, 476 S.W.3d at 546; *State Office of Risk Mgmt.*, 300 S.W.3d at 11.

James argues that because this case does not fall within the *Tana Oil* exception, the general rule that a premature directed verdict constitutes reversible error applies, and this Court need not conduct a harm analysis. Under the unique facts of this case, we disagree.

As part of its burden of proof, the State was required to prove that James was a repeat sexually violent offender. *See* TEX. HEALTH & SAFETY CODE § 841.003(a) (providing that person is sexually violent predator under SVP Act if person "is a repeat sexually violent offender" and "suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence"). A person is a repeat sexually violent offender if the person "is convicted of more than one sexually violent offense and a sentence is imposed for at least one of the offenses." *Id.* § 841.003(b). The SVP Act defines which offenses are considered sexually violent offenses, and this definition includes aggravated sexual assault of a child and aggravated kidnapping when the offense is committed "with the intent to violate or abuse the victim sexually." *Id.* § 841.002(8)(A), (B); *see* TEX. PENAL CODE § 20.04(a)(4) (providing that person commits offense of aggravated kidnapping if he "intentionally or knowingly abducts another person with the intent to . . . inflict

34

bodily injury on him or violate or abuse him sexually"); *id.* § 22.021(a) (setting out elements of aggravated sexual assault).

To meet its burden of proof, the State introduced both testimonial and documentary evidence in its case-in-chief. Both Dr. Price and Dr. Gaines testified that James had convictions for nine sexually violent offenses: a conviction for rape in 1978; a conviction for rape in 1984; convictions for three counts of aggravated kidnapping in 1991; and convictions for four counts of aggravated sexual assault of a child in 1991. James pleaded guilty to all these offenses. He was placed on probation for the 1978 rape offense, but he received and served prison sentences for each of the other offenses. The trial court admitted copies of the judgments and sentences for each offense. The trial court also admitted copies of the indictments for the 1991 offenses, which alleged that, with respect to the aggravated kidnapping offenses, James committed the offense with the intent to violate and abuse the respective complainants sexually.

James also testified as part of the State's case-in-chief. James acknowledged that, at the time of trial, he was incarcerated and was serving sentences for seven offenses: four convictions for aggravated sexual assault of a child and three convictions for aggravated kidnapping. These convictions involved four different complainants. He also admitted that this was not his first time in prison and that he had previously been incarcerated for a rape conviction. He further admitted that he

35

had another prior rape conviction in California, that he had been placed on probation, and that he had participated in a hospital treatment program after that conviction. The State questioned James extensively about the details of each of these offenses. Although James denied that he had committed the sexual offenses—stating that he had consensual sex with the two adult complainants and admitting that he kidnapped three of the child complainants with the intent of having sex with them but denying that he sexually assaulted them—he unequivocally admitted that he had been convicted of nine different offenses.[8]

James also testified as the only witness in his own case-in-chief. James again acknowledged that he had pleaded guilty to the offense of rape in California in 1978 and to the offense of rape in Tarrant County in 1984, although he again stated that he did not rape these complainants. James also again acknowledged that he pleaded

---

[8] James denied that he was guilty of the sexually violent offenses, but this does not create a fact issue on the pertinent question whether he was convicted of the offenses and had a sentence imposed for at least one of them. *See In re Commitment of Black*, 522 S.W.3d 2, 5 (Tex. App.—San Antonio 2017, pet. denied) ("Even if there was evidence at Black's civil commitment proceeding showing he did not actually intend to commit a sexual assault when he committed burglary, it is undisputed that he was *convicted* of committing burglary *with the intent to commit sexual assault.* . . . We hold Black's testimony is not probative evidence of the material fact of whether he was 'convicted' of burglary *with the intent to commit sexual assault.*"); *In re Commitment of Barrientos*, No. 01-17-00649-CV, 2018 WL 3384563, at *4 (Tex. App.—Houston [1st Dist.] July 12, 2018, pet. denied) ("Although he denies committing either offense, Barrientos's denials of guilt do not raise a question of fact as to whether he was convicted of these offenses and sentenced for at least one of them."). The evidence is undisputed that James has been convicted of nine sexually violent offenses and that he had a sentence imposed for at least one of them.

guilty to seven offenses in 1991. He offered explanations for why he pleaded guilty to all these offenses even though he claimed that he did not commit these offenses. James's testimony on these issues occurred before the State moved for a directed verdict on the repeat sexually violent offender element of its case.[9]

Although the trial court granted a directed verdict in favor of the State on the question whether James was a repeat sexually violent offender before James had rested his case-in-chief, this occurred after he had admitted—during both the State's case-in-chief and his own—that he had been convicted of nine sexually violent offenses and had a sentence imposed for at least one of them. The State's other witnesses—Dr. Price and Dr. Gaines—also testified that James had convictions for nine sexually violent offenses, and the trial court admitted the judgments and sentences for each offense. It was therefore undisputed that James had been convicted of more than one sexually violent offense and a sentence had been imposed for at least one of the offenses. *See* TEX. HEALTH & SAFETY CODE § 841.003(b) (defining "repeat sexually violent offender"); *Harris*, 541 S.W.3d at 331 ("But if there are no disputed facts regarding this element, the person's status as a repeat sexually violent offender is appropriate for partial directed verdict.");

---

[9]     Even after the trial court granted the directed verdict, James acknowledged that he had been incarcerated for the rape offense that occurred in Tarrant County. The State asked, "And yet after being incarcerated for that second rape, you did commit these other offenses?" James responded, "Unfortunately, yes." He then stated that none of the allegations against him were true.

*Talley*, 522 S.W.3d at 750–51 ("Because Talley admitted to his repeat offender status in his pleadings, this element was conclusively established and not a contested issue for the jury to determine."). James therefore had an opportunity to present a defense on this issue, but not only did he not challenge the State's proof that he had been convicted of more than one sexually violent offense, he affirmatively admitted it during his testimony before the trial court granted the directed verdict.

Under the facts of this case, we conclude that the trial court's error in granting a directed verdict before James rested his case-in-chief was harmless.[10] *See State Office of Risk Mgmt.*, 300 S.W.3d at 11–12 (noting that while "it is generally reversible error for the trial court to direct a verdict without allowing the plaintiff to

---

[10] We note that the Fourteenth Court of Appeals has held that when a case does not fall within the *Tana Oil* exception, the trial court commits reversible error in granting a directed verdict against a defendant before he had an opportunity to present his case-in-chief. *See Stearns v. Martens*, 476 S.W.3d 541, 546–47 (Tex. App.—Houston [14th Dist.] 2015, no pet.). In *Stearns*, a divorce proceeding, one of the issues was whether shares in a company were the petitioner's separate property. *Id.* at 545. The trial court granted a directed verdict in favor of the petition on this issue after the petitioner rested her case-in-chief and before the respondent had a chance to present any of his case-in-chief. *Id.* at 547. The Fourteenth Court noted that the case did not fall within the *Tana Oil* exception because "none of [the potential bases for affirming the directed verdict] rely on [the respondent's] purported affirmative limitation of his claims to damages he cannot recover as a matter of law." *Id.* The Fourteenth Court held that the trial court committed reversible error when it granted a directed verdict against the respondent "before he had an opportunity to present his case-in-chief." *Id.* Here, although James had not yet finished his case-in-chief at the time the trial court granted the directed verdict, James had already admitted during his case-in-chief (as well as when he testified during the State's case-in-chief) that he had nine convictions for sexually violent offenses and that a sentence had been imposed for at least one of those offenses. *Stearns* is therefore distinguishable from the present case.

present all of its evidence," Texas Supreme Court had, in *Tana Oil*, "held that a procedural error in granting a directed verdict before the close of evidence did not require reversal where no harm was shown"); TEX. R. APP. P. 44.1(a) (providing that, in civil case, no judgment may be reversed on appeal on ground that trial court made error of law unless court of appeals concludes error probably caused rendition of improper judgment or probably prevented appellant from properly presenting case to court of appeals).

We overrule James's second issue.

### Jury Charge Error

In his third issue, James argues that the trial court erred by refusing to instruct the jury that, while its determination that he is a sexually violent predator was required to be unanimous, it could determine that he was not a sexually violent predator by a non-unanimous, 10-2 verdict.

As noted above, the SVP Act provides that "a civil commitment proceeding is subject to the rules of procedure and appeal for civil cases," but "[t]o the extent of any conflict between [the SVP Act] and the rules of procedure and appeal for civil cases, [the SVP Act] controls." TEX. HEALTH & SAFETY CODE § 841.146(b). Texas Rule of Civil Procedure 292(a), which governs jury verdicts in civil cases, states that "a verdict may be rendered in any cause by the concurrence, as to each and all answers made, of the same ten or more members of an original jury of twelve." TEX.

39

R. Civ. P. 292(a). Health and Safety Code section 841.062(b) provides that "[a] jury determination that the person is a sexually violent predator must be by unanimous verdict." Tex. Health & Safety Code § 841.062(b). There is "no question" that for a jury to find that a person is a sexually violent predator, it must do so unanimously. *In re Commitment of Jones*, 602 S.W.3d 908, 912 (Tex. 2020). Thus, because section 841.062(b) conflicts with Rule 292(a), section 841.062(b) controls. *Id.*

However, section 841.062(b) "addresses only the number of votes needed for a 'yes' verdict—that is, a verdict for the State finding '*that* the person *is* a sexually violent predator.'" *Id.* (quoting Tex. Health & Safety Code § 841.062(b)). The statute is silent "about the number of votes needed for a 'no' verdict," or a verdict declining to find that the defendant is a sexually violent predator. *Id.* As the Texas Supreme Court noted, if the Legislature had intended for section 841.062(b) to apply to both "yes" and "no" verdicts, "it could easily have done so, for example, by requiring unanimity for a 'determination *of whether* the person is a sexually violent predator.'" *Id.* The supreme court concluded that because the plain language of section 841.062(b) applies only to "yes" verdicts under the SVP Act, Rule 292(a) applies to "no" verdicts. *Id.* at 913. A unanimous jury verdict is therefore required to find that a defendant is a sexually violent predator, but only ten votes are necessary to reach a verdict declining to find that the defendant is a sexually violent predator.

*Id.* "Consequently, a defendant who requests that the jury be instructed to that effect is entitled to the submission of such an instruction." *Id.*

Here, James requested that the trial court instruct the jury in the charge that, while a "yes" answer to the question whether James was a sexually violent predator was required to be unanimous, a "no" answer only required the votes of ten jurors. The trial court overruled this request and instructed the jury that its verdict was required to be unanimous. We conclude that the trial court's refusal to include James's requested instruction was erroneous. *See id.* We therefore turn to whether this error was harmful.

Texas Rule of Appellate Procedure 44.1(a) provides:

(a)  No judgment may be reversed on appeal on the ground that the trial court made an error of law unless the court of appeals concludes that the error complained of:

(1)  probably caused the rendition of an improper judgment; or

(2)  probably prevented the appellant from properly presenting the case to the court of appeals.

TEX. R. APP. P. 44.1(a). A jury's unanimous verdict finding that a defendant is a sexually violent predator demonstrates that the trial court's error in refusing to submit the requested 10-2 instruction did not affect the jury's verdict. *Jones*, 602 S.W.3d at 914. "[W]e must presume that the jurors voted the way they did because they were conscientiously convinced of the result they reached." *Id.* at 915. When the members of a jury unanimously come to the conclusion that a defendant is a

41

sexually violent predator, "an instruction explaining that a vote of ten of the jurors was sufficient for a verdict declining to find that [the defendant is a sexually violent predator] would not have changed the outcome" of the case. *Id.*

In this case, the jury unanimously determined that James is a sexually violent predator. We therefore conclude that the trial court's failure to submit James's requested 10-2 instruction did not probably cause the rendition of an improper judgment, and the trial court's error was harmless. *See id.*; *In re Commitment of Hill*, 621 S.W.3d 336, 346 (Tex. App.—Dallas 2021, no pet. h.) (concluding that because jury unanimously found defendant was sexually violent predator, "an instruction explaining that a vote of ten jurors was sufficient for a verdict declining to find Hill is a sexually violent predator would not have changed the outcome of this case"); *In re Commitment of K.H.*, 609 S.W.3d 247, 257 (Tex. App.—Houston [14th Dist.] 2020, pet. denied) (concluding that trial court erred by not giving requested 10-2 instruction, but "because the jury unanimously found that appellant was a sexually violent predator, the error did not probably cause the rendition of an improper judgment").

We overrule James's third issue.

## Conclusion

We affirm the judgment of the trial court.


April L. Farris
Justice

Panel consists of Justices Kelly, Guerra, and Farris.